# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| OLUWASEUN "SEUN" ADENEKAN, DONNA EDMONDS, DONNA MILLER, TISHA APPLINE, Individually and on behalf of similarly situated employees, <br><br> Plaintiff, <br><br> v. <br><br> CLINICAL RESOURCES, LLC, and JENNIFER SCULLY, Individually, <br><br> Defendants. | No.: <br><br><br> FLSA COLLECTIVE ACTION |

## COMPLAINT

Come now the Plaintiffs, Oluwaseun "Seun" Adenekan, Donna Edmonds, Donna Miller, and Tisha Appline, individually and on behalf of similarly situated employees (hereinafter "Plaintiffs"), by and through counsel, and sue Defendants Clinical Resources, LLC, and Jennifer Scully, individually, as follows:

### PARTIES, JURISDICTION, AND VENUE

1. This case arises under the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. § 201 *et seq.* and Tennessee common law. Plaintiffs bring this claim individually and as part of a collective action pursuant to 29 U.S.C. § 216(b).

2. The Court has subject matter jurisdiction pursuant to 29 U.S.C. § 216(b) and 28 U.S.C. § 1331.

3. Venue lies in the Eastern District of Tennessee pursuant to 28 U.S.C § 1391.

1

4. Defendant Clinical Resources is a Georgia limited liability company that is registered with the Tennessee Secretary of State and conducts significant business operations in this State. Its agent for service of process is located in Brentwood, Tennessee.

5. Upon information and belief, Defendant Jennifer Scully is a resident of Georgia. She directs recruitment efforts to Tennessee residents, regularly enters into contracts with people and entities who reside in Tennessee, and regularly conducts business in this State.

6. The lead plaintiff in this action, Seun Adenekan, is a resident of Knox County, Tennessee. He communicated with both Defendants from his home in Knox County, Tennessee, received at his home documents and information provided by both Defendants, and executed (purported) contracts with Defendants at his residence in Knox County, Tennessee.

7. Defendant Clinical Resources is engaged in interstate commerce, is a commercial enterprise, and is a covered employer under the FLSA.

8. Defendant Jennifer Scully is the President, CEO, and founder of Defendant Clinical Resources. As it pertains to each Plaintiff and his or her employment, Defendant Scully dealt directly with each Plaintiff, was involved in the daily operations of Clinical Resources as to each Plaintiff's work assignment, implemented Clinical Resources's wage policies, and refuted multiple Plaintiffs' assertions and/or questions that they were entitled to overtime compensation. Therefore, Defendant Scully is a covered employer under the FLSA.

9. In addition to the Plaintiffs named herein, Defendants employ and have employed within the last three years numerous other similarly situated employees who are also covered employees under the FLSA.

**FACTUAL BASIS**

**Relationship with Clients**

10. Defendant Clinical Resources is, among other things, a healthcare staffing firm. Its business model consists of selecting and placing its healthcare professionals, such as nurses, with clients who need those professionals. Upon information and belief, Clinical Resources has contracts with facilities in all 50 states.

11. Among the value and services Clinical Resources markets to clients is that it "personally screen[s] and select[s] the right professionals for our clients." Upon information and belief, Clinical Resources chooses the person to fill the client's specific staffing needs based on the company's screening and selection process.

12. A necessary and foundational component of Clinical Resources' business model is to recruit and retain medical personnel to fill its clients' vacancies or personnel needs.

13. Per the contracts with each facility, the facility reimburses Clinical Resources a predetermined hourly rate, plus certain expenses, for each hour Clinical Resources personnel work at the facility.

**Relationship with Medical Professionals**

14. Clinical Resources advertises job openings on its webpage and through other media. Applicants then follow traditional application processes, including submitting their résumés, being interviewed, providing educational and licensure information, etc.

15. Clinical Resources' written application is entitled "Employee/Contractor Application." Except for using the terms "employ[ ]" and "contract[ ]" interchangeably, or using both words in the same phrase, the application requests the same information and contains the same acknowledgments as typical employment applications. It also contains acknowledgments

that the applicant is an employee at will and that Clinical Resources is an equal opportunity employer.

16. Nearly all of Clinical Resources' nurse openings were for "travel nurse" positions even if not so named. A travel nurse is someone who, though working full-time as a career nurse, works temporarily or semi-permanently at a particular facility until the facility no longer needs the person, at which the time the nurse will move – sometimes many states away – to another facility. Generally, the job is for a specified period or is terminated by the placement agency according to its contract with the client-facility.

17. At the time of hiring nurse applicants, Clinical Resources presents them with a Contractor Agreement. By its terms, the Contractor Agreement continues indefinitely until either party terminates it. The Contractor Agreement (Adenekan's) is attached as **Appendix A**.

18. The Contractor Agreement uses the word "consultant" interchangeably with "independent contractor" in a purported effort to establish the nurses' relationship with Clinical Resources as that of an independent contractor. In reality, no nurses employed by Clinical Resources, including each Plaintiff herein, held out himself or herself as a consultant, ever performed consulting work for Clinical Resources or its clients, or ever applied to work as a nursing consultant with Clinical Resources.

19. In addition to the Contractor Agreement, Clinical Resources presents nurses with a document titled Assignment Schedule No. [x], which sets forth the location of the job assignment, the client's contact information, and the hourly rate at which Clinical Resources will compensate the nurse. Per the terms of the Contractor Agreement, multiple Assignment Schedules could be in effect at the same time.

20. Although nurses were not obligated to accept a particular assignment, Clinical Resources presented nurses with numerous assignments from which they could choose. Once

4

Case 3:19-cv-00436-KAC-DCP   Document 1   Filed 11/04/19   Page 4 of 14   PageID #: 4

accepted, nurses were obligated to perform typical and customary nursing services, consistent with their respective licensure, at Clinical Resources' clients' facilities.

21. Depending on Clinical Resources' clients' needs, the company provides its nurses with rigorous and comprehensive training and assessments.

**Facts common to each Plaintiff**

22. Each Plaintiff does work or has worked for Defendants as a nurse, either as a registered nurse (RN) or licensed practical nurse (LPN). They performed customary and ordinary nursing duties at each facility Clinical Resources assigned them.

23. Some of Plaintiffs' RN and LPN coworkers were employees of the facility; others were temporary or semi-permanent nurses employed by staffing agencies like Clinical Resources. Regardless, they all performed the same job duties consistent with their respective positions (i.e. RN or LPN).

24. Plaintiffs had no prior relationship with any of Clinical Resources' clients at whose facilities they worked. All details about the job and facility were made known to them by Defendants.

25. Defendants established the workweek applicable to each of Plaintiff (i.e., "12:01 a.m. Sunday through 12:00 midnight on Saturday (sic)").

26. The length of each Plaintiff's assignment was negotiated and set by Clinical Resources and/or the client. Plaintiffs were not free to adjust their work schedule, leave the assignment without permission, or hire helpers.

27. Clinical Resources and Scully required Plaintiffs to track and document each hour Plaintiffs worked per workweek; additionally, these Defendants scripted the timing, method, and manner in which Plaintiffs were required to submit their timesheets to Defendants.

5

28. For most day to day supervision, Clinical Resources and Scully delegated these responsibilities to the individual clients. However, in the event of a performance problem or ordinary employment dispute, both the client and nurse were expected to bring the matter to Clinical Resources' and Scully's attention.

29. Clinical Resources represented to each Plaintiff that the company had the right to evaluate his or her work performance. Moreover, the company represented to its clients that "performance monitoring" was included in the service offering.

30. Each Plaintiff was paid directly by Clinical Resources.

31. Clinical Resources and Scully set each Plaintiff's hourly pay rate. All wages (excluding reimbursable expenses) were calculated by multiplying the Plaintiff's hourly rate by the number of hours worked in a single workweek.

32. Defendants did not pay the Plaintiffs on a salary basis or a fee basis.

33. Given that the details of the job assignment were set by Clinical Resources and/or its client, and based on the method Defendants used to calculate the Plaintiffs' compensation, Plaintiffs could not increase their profits through their own initiative (e.g., by treating more patients).

34. While on assignment for Clinical Resources, which often spanned many weeks or months, Plaintiffs' work schedules and job responsibilities did not allow for other gainful employment; Plaintiffs were wholly economically dependent on Defendant.

35. Plaintiffs did not market themselves or hold themselves out to the general public as available for hire. Instead, Plaintiffs' income flowed directly from Defendants' ability to market their business and attract paying clients.

36. Plaintiffs did not provide the equipment, supplies, or materials required to perform their jobs.

6

Case 3:19-cv-00436-KAC-DCP   Document 1   Filed 11/04/19   Page 6 of 14   PageID #: 6

37. Clinical Resources made nurses' travel and lodging arrangements to, from, and at the clients' location.

38. Defendants prohibited nurses from bringing pets with them when living out of town on assignment.

39. Defendants required their nurses to notify them of all absences, including sick days.

40. Although the particular shifts may have varied, Clinical Resources—either on its own authority or by contractual agreement with its client—required Plaintiffs to work at least forty hours per week. In reality, however, Plaintiffs worked substantially longer hours every or almost every week of the assignment. As but one example, Plaintiff Adenekan submitted to Clinical Resources his timesheet for January 7 through January 13, 2018, documenting 99 hours spread over the seven-day workweek.

41. Defendants prescribed the manner of Plaintiffs' dress, required them to conform to a code of conduct and employee handbook, and required their acknowledgment that they "may be assigned to work in a Health Care setting as a contractor or employee representing Clinical Resources, LLC . . ."

42. Defendants never paid overtime wages for any hour over forty Plaintiffs worked in a workweek.

**Facts specific to Seun Adenekan**

43. Plaintiff Adenekan began working for Defendants on December 6, 2017. On that date, Defendants presented him the Contractor Agreement, which he received and signed at his home in Knoxville, Tennessee. Defendant Scully also signed it that day.

44. Adenekan is a registered nurse ("RN"). He worked for Defendants continuously from approximately December 11, 2017, through May 15, 2018.

45. Defendants compensated Mr. Adenekan at a rate of $40 per hour.

46. Per the timesheets Defendants required him to submit, he sometimes worked multiple weeks without a day off, and he regularly worked between 70 and 90 hours per week.

47. At each of the facilities to which Defendants assigned him, he learned that his coworkers, who were employed either by the facility or other staffing agencies like Clinical Resources, who performed identical duties as he, and who had similar working hours, received the overtime premium. When he inquired of Defendant Scully as to why Defendants were not paying overtime, Defendant Scully said that the client-facilities did not pay a premium to Clinical Resources and therefore Defendants did not pay their nurses the overtime premium.

48. Mr. Adenekan is personally aware of other individuals who worked for the Defendants as registered nurses, whose duties were identical to his, that Clinical Resources subjected to the same policies and procedures as he, who worked far greater than 40 hours per week, and to whom Defendants likewise did not pay the overtime premium.

**Facts specific to Donna Edmonds**

49. Donna Edmonds is a Licensed Practical Nurse ("LPN"). She began working for Defendants in approximately February 2015, which continued into 2018. Plaintiff Edmonds does not currently know the precise dates of her employment but avers that Defendants' records will reflect those dates.

50. She regularly and repeatedly worked more than 40 hours per week at Defendants' clients' facilities.

51. Throughout her tenure, Plaintiff Edmonds worked in multiple states.

8

52. Defendants paid Ms. Edmonds $30 per hour.

53. Like Plaintiff Adenekan, Ms. Edmonds' LPN coworkers who performed identical tasks, worked similar hours, and reported to the same onsite managers as she, told her they received time-and-a-half pay for overtime work. Some of these LPN coworkers were regular employees of the facility, and some were employees placed by a company like Clinical Resources.

54. When Ms. Edmonds asked Defendants if they would pay overtime, Defendant Scully rejected the idea by saying the facilities do not pay more money to Clinical Resources for their nurses' overtime work.

55. Ms. Edmonds is personally aware of other people who worked for Defendants as LPNs, whose duties were identical to hers, that Defendants subjected to the same policies and procedures as she, who worked far greater than 40 hours per week, and to whom Defendants also did not pay the overtime premium.

**Facts specific to Donna Miller**

56. Donna Miller is a RN who began her employment with Defendants in approximately September 2015 and continued through July 2019.

57. Defendants assigned Ms. Miller to work in several states, including Vermont, Pennsylvania, and Virginia.

58. Defendants paid Ms. Miller $40 per hour.

59. Ms. Miller learned that other RNs with whom she worked and who performed identical tasks as she received overtime pay (and holiday pay), and she advised Defendant Scully of this. Defendant Scully, as with the other Plaintiffs, explained that the client would not pay extra for those days or hours, and therefore, Defendants would not pay the overtime premium to their nurses.

9

**Facts specific to Tisha Appline**

60. Tisha Appline is a LPN who began her employment with Defendants in January 2015 and continued through March 2018.

61. Defendants assigned Ms. Appline to work in several states, including Vermont, Pennsylvania, and Virginia.

62. Defendants paid Ms. Appline $30 per hour.

63. Like the other Plaintiffs, Ms. Appline learned that other LPNs with whom she worked and who performed identical tasks as she received overtime pay. These coworkers included LPNs placed by companies like Clinical Resources. Defendants, however, did not pay the overtime premium for any hour over forty Ms. Appline worked.

## CAUSES OF ACTION

**Fair Labor Standards Act:  Failure to pay overtime**

64. The averments of paragraphs 1 through 63 are incorporated into this section by reference.

65. Pursuant to the FLSA, employers must compensate their employees for overtime work "at a rate not less than one and one-half times the regular rate at which the employee is actually employed" after the first 40 hours of work. 29 C.F.R. § 778.107.

66. Defendants have never paid Plaintiffs the overtime wage despite Defendants' knowledge or requirement that each of their nurses work(ed) substantially more than 40 hours in a given week.

67. In an intentional, willful, and concerted effort to avoid the costs of overtime wages, state/federal withholdings, workers' compensation protection, health insurance

10

premiums, and other mandated costs employers ordinarily absorb, Defendants forced its employees, including Plaintiffs, to sign fraudulent and legally void "contracts" that purported to establish Plaintiffs' status alternately as "contractor" or "consultant."

68. Clinical Resources' founder, President, and CEO Jennifer Scully possesses decades'-worth of experience in a variety of medical and nursing-related fields. As someone with experience in all levels of the profession, she has actual knowledge that RNs and LPNs are entitled to receive overtime compensation for hours worked over 40 in a single workweek. She also knew, but willfully disregarded, that nurses working for her company were not contractors or consultants but, instead, were employees.

69. Whenever RNs and LPNs inquired about their entitlement to overtime compensation, Defendant Scully knew that her explanation, which conditioned the nurses' rights to receive overtime pay on the facilities' willingness to pay it, was false and inaccurate. But, she repeated this assertion, and variations of it, to avoid paying overtime wages.

**Unjust Enrichment**

70. The averments of paragraphs 1 through 69 are incorporated into this section by reference.

71. Plaintiffs and other similarly situated employees conferred substantial benefits on both Defendants by performing nursing-related services on Defendants' behalf for which Defendants knowingly and willfully withheld the overtime premium the law required Defendants to pay. To keep Plaintiffs working under this illegal arrangement, Defendant Scully, individually and on behalf of Clinical Resources, made statements and representations she knew to be false.

11

Case 3:19-cv-00436-KAC-DCP    Document 1    Filed 11/04/19    Page 11 of 14    PageID #: 11

72. Defendants were keenly aware that Plaintiffs and the other RNs and LPNs were working a substantial amount of inadequately and illegally compensated hours.

73. Defendants made and continue to make enormous profits directly tied to the uncompensated work performed by Plaintiffs and their coworkers. Allowing Defendants to reap the extraordinary benefit of their employees' labor without having to compensate them is manifestly unjust.

## DAMAGES

74. As a direct, proximate, and exclusive result of Defendants' willful violations of the FLSA and their unjust enrichment from Plaintiffs' undercompensated labor, Plaintiffs and similarly situated employees have experienced substantial monetary losses and damages, including lost wages, attorney fees, and costs.

## COLLECTIVE ACTION CLAIMS

75. Like Plaintiffs, there are numerous current and former RNs and LPNs who within the last three years have worked as Defendants' employees and who Defendants have willfully misclassified as independent contractors and/or consultants. These individuals performed the same normal and customary duties of RNs and LPNs, respectively, were subject to the same timekeeping and reporting policies, were told (some of them) the same false information about why they were not entitled to overtime compensation, were paid $40 per hour (RNs) or $30 per hour (LPNs) even for hours worked over forty, were subject to the same travel procedures, were required to sign the fraudulent and/or invalid Contractor Agreement followed by Assignment Schedules, reported to Defendant Scully, and worked far in excess of forty hours every or almost every week of his/her assignment.

76. Plaintiffs are representatives of those current and former employees and are acting on behalf of the other employees' interests, as well as their own interests, in bringing this action.

77. Defendants can readily identify through its records those RNs and LPNs who within the last years have performed work for or on behalf of Defendants.

78. Each Plaintiff has given his or her written consent to proceed collectively in this action, and their consents are being filed contemporaneously herewith as **Appendix B**.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Oluwaseun "Seun" Adenekan, Donna Edmonds, Donna Miller, and Tisha Appline, individually and on behalf of similarly situated employees, pray for the following relief:

79. Authorization to issue a notice pursuant to 29 U.S.C. § 216(b) at the earliest possible time to all current and former RNs and LPNs who performed work for Defendants during the three (3) years immediately preceding the filing of this action, to inform them that this action has been filed, of the nature of the action, and of their right to opt in to this lawsuit;

80. A declaratory judgment that the Contractor Agreement is void ab initio and violates established public policy pertaining to the misclassification of employees;

81. A declaratory judgment that Plaintiffs and similarly situated workers were employees, not independent contractors;

82. A judgment that Defendants have violated the overtime provisions of the FLSA as to Plaintiffs and those similarly situated persons who opt into this action;

83. A judgment that Defendants' violations of the FLSA were willful;

84. An award of damages in the amount of unpaid overtime compensation to be proven at trial;

85. An award of liquidated damages in an amount equal to the overtime compensation shown to be owed them pursuant to 29 U.S.C. § 216(b);

86. An award of post-judgment interest;

87. An award of reasonable attorneys' fees and costs pursuant to 29 U.S.C. § 216(b); and

88. An award of such other and further legal and equitable relief as may be appropriate under the facts of this case.

RESPECTFULLY SUBMITTED,

*s/ Jesse D. Nelson*
JESSE D. NELSON (BPR # 025602)
NELSON LAW GROUP, PLLC
*Attorneys for Plaintiffs*
10263 Kingston Pike
Knoxville, TN 37922
(865) 383-1053
jesse@NLGattorneys.com